[No. H032734. Sixth Dist. Oct. 16, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
MILAN PAUL PAKES, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

*Under California Rules of Court, rules 8.1105(c), 8.1110, and 8.1120, only the Introduction, section II. Statement of Facts, part III.B.1., 2., of the Discussion, and part IV. Disposition are certified for publication.

126

**Counsel**

Dallas Sacher, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Jeffrey M. Laurence, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MIHARA, Acting P. J.**—Defendant Milan Paul Pakes appeals from a judgment of conviction entered after a jury found him guilty of child endangerment (Pen. Code, § 273a, subd. (a)), evading a police officer (Veh. Code, § 2800.2), and hit and run causing property damage (Veh. Code, § 20002, subd. (a)). In a bifurcated proceeding, defendant admitted the allegations that he had two prior strike convictions (Pen. Code, §§ 667, subds. (b)–(i), 1170.12) and served a prior prison term (Pen. Code, § 667.5, subd. (b)). The trial court sentenced defendant to an indeterminate term of 25 years to life to run consecutive to a determinate term of four years. On appeal, defendant raises several issues relating to the sufficiency of the evidence, jury instructions, and sentencing. We conclude that the four-year term imposed on the Vehicle Code section 2800.2 conviction should have been stayed pursuant to Penal Code section 654. Accordingly, we reverse the judgment and remand for resentencing.[1]

### I. Statement of the Case*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II. Statement of Facts

Sometime during the summer of 2001, 12-year-old Adrienne F., who lived with her family in a mobilehome park, met defendant. Defendant then became a friend to the F. family, and would spend time "24/7" with Adrienne, her father, and her sister at their home. He was at their home every day when he was not working, and he would also occasionally spend the night there.

Defendant drove a pickup truck. In late 2001, he was teaching Adrienne how to drive. He allowed her to drive the truck around the mobilehome park on more than 10 occasions. Adrienne did not wear a seatbelt, because defendant told her that the clips did not work.

On December 14, 2001, defendant spent the night at the F. home. The following day, he invited Adrienne to go with him on a chimney sweeping job. After her parents gave her permission to go with defendant, Adrienne and defendant left the mobilehome park at 2:30 p.m. Defendant and Adrienne left the job site after a couple of hours. About 5:00 or 6:00 p.m., defendant was driving his truck on Highway 87. Adrienne was not wearing a seatbelt. When

---

[1] Defendant has also filed a petition for writ of habeas corpus, which we have considered with this appeal. We dispose of his habeas corpus petition by separate order.

*See footnote, *ante,* page 125.

the traffic became heavier near Curtner Avenue, defendant suddenly slammed on his brakes and hit the SUV in front of him.

David Gonzalez, an off-duty police officer, was driving the SUV. Officer Gonzalez, who had been driving slowly in the left lane at the time of the collision, pulled over to the center shoulder and rolled down his passenger window as defendant pulled abreast of the SUV. Defendant also rolled down his window. Officer Gonzalez asked defendant to pull over so they could exchange information, because his vehicle had been damaged. Defendant agreed to do so.

Defendant drove onto the left shoulder in front of Officer Gonzalez. However, he did not stop. Instead, he drove "[r]eally fast" on the shoulder.[2] Officer Gonzalez "didn't want to go too fast on the shoulder, but [he] stayed where [he] could see him, less than a quarter mile." When traffic cleared, defendant swerved back into the left lane and continued to go north on Highway 87. He was weaving in and out of traffic, and he cut off at least five cars, forcing them to slam on their brakes to avoid him. Officer Gonzalez used his cell phone to report to the police dispatcher that defendant had failed to stop after an accident. Officer Gonzalez could see Adrienne sliding from side to side inside defendant's truck. Adrienne was "really scared." She screamed at defendant to take her home and to stop and pull over. She also told him that it would just get worse if he kept going. Defendant told her to "shut up and duck down so they don't see you."

Defendant exited Highway 87 onto southbound Highway 280, and cut off two or three cars. Defendant continued to weave between lanes before he exited onto Sixth Street.[3] Officer Gonzalez exited the highway about 20 seconds after defendant and followed him on surface streets until he saw a marked police car at Second or Third Street and Keyes Street.

Sergeant Robert St. Amour was driving a marked police car at around 5:45 p.m. when he heard the dispatch to be on the lookout for defendant's truck. As Sergeant St. Amour was driving on First Street, he saw defendant's truck driving west on Humboldt Street. Humboldt is one way in the other direction. Defendant then turned north on Second Street which is one way southbound. Three or four cars were traveling south on Second Street at that time. According to Adrienne, one of the cars was forced to swerve out of the way. Sergeant St. Amour was able to watch defendant, because First and Second Streets are separated by a park that is no more than 30 feet wide.

---

[2] Officer Gonzalez estimated that defendant was driving on the shoulder at 40 to 50 miles per hour.

[3] The exit is labeled Seventh Street, but it actually leads to Sixth Street.

As Sergeant St. Amour turned from First Street onto Keyes Street and headed to Second Street, he activated his red lights and siren. The officer reached the intersection of Second Street and Keyes Street before defendant, who was 75 to 100 feet from the intersection. He positioned his patrol car across the end of Second Street, thereby blocking the center lane and portions of the right and left lanes. Defendant continued driving the wrong way towards the patrol car. There was just enough room between the end of the patrol car and the curb for defendant to turn right on Keyes Street. Sergeant St. Amour started to follow defendant on Keyes Street. However, his glasses slipped off as he reached for the radio to report the chase, and he was delayed momentarily while he put them back on.

Defendant turned left on Third Street. He was driving 35 miles per hour when the posted speed limit was 30 miles per hour. With his lights and siren activated, Sergeant St. Amour continued to chase defendant. Defendant turned left on Virginia, then turned left on Second Street, heading southbound. It was dark, and defendant was driving 35 miles per hour on Second Street when the posted speed limit was 30 miles per hour. There was an unsecured ladder in the bed of defendant's truck. The ladder was hanging over the tailgate and sliding with each turn. According to the officer, defendant's speed was unsafe for the conditions, time, and location. Defendant then turned left in the middle of the block without signaling and drove onto the curb. Both tires were up on the curb and the truck was sticking out into the street. Defendant told Adrienne to get out of the truck so he could leave. When Sergeant St. Amour pulled up next to defendant's truck, another patrol car arrived. As defendant ran towards his father's house, Sergeant St. Amour ordered him to stop. Defendant was eventually arrested.

The parties stipulated that "the first on-duty police officer in a marked police car to encounter the defendant after the defendant's collision with off-duty Officer Gonzale[z]'s vehicle was Sergeant St. Amour. There were no marked police cars behind the defendant's truck as he drove the wrong way on Second Street." The parties also stipulated that "the defendant admits that he intended to flee following the traffic accident with another vehicle because he reasonably believed that if he was apprehended by the police, he would be sent to state prison."

Milan Pakes, defendant's father, testified for the defense. After defendant was arrested, defendant's brother drove the truck while Pakes was in the passenger seat. Pakes used the seatbelt, which was functional.

## III. Discussion

### A. Child Endangerment*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. Vehicle Code Section 2800.2[8]

Defendant raises several challenges to his conviction for violating section 2800.2.

#### 1. Background

Section 2800.2 states in relevant part: "(a) If a person flees or attempts to elude a pursuing peace officer in violation of Section 2800.1 and the pursued vehicle is driven in a willful or wanton disregard for the safety of persons or property, the person driving the vehicle, upon conviction, shall be punished by imprisonment in the state prison, or by confinement in the county jail for not less than six months nor more than one year. . . . [¶] (b) For purposes of this section, a willful or wanton disregard for the safety of persons or property includes, but is not limited to, driving while fleeing or attempting to elude a pursuing peace officer during which time either three or more violations that are assigned a traffic violation point count under Section 12810 occur, or damage to property occurs."[9]

Here, the trial court instructed the jury on the two alternative theories pursuant to CALCRIM No. 2181.[10] Thus, the trial court instructed the jury that defendant could be convicted of violating section 2800.2 on the basis of

---

*See footnote, *ante*, page 125.

[8] All further statutory references are to the Vehicle Code unless otherwise stated.

[9] Section 2800.1 sets out the requirements for a finding of flight from a pursuing peace officer. As relevant here, subdivision (a) of section 2800.1 states: "Any person who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle, is guilty of a misdemeanor . . . if all of the following conditions exist: [¶] (1) The peace officer's motor vehicle is exhibiting at least one lighted red lamp visible from the front and the person either sees or reasonably should have seen the lamp. [¶] (2) The peace officer's motor vehicle is sounding a siren as may be reasonably necessary. [¶] (3) The peace officer's motor vehicle is distinctively marked. [¶] (4) The peace officer's motor vehicle is operated by a peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code, and that peace officer is wearing a distinctive uniform."

[10] The trial court instructed the jury: "A person acts with wanton disregard for safety when: one, he or she is aware that his or her actions present a substantial and unreasonable—unjustifiable risk of harm; and two, he or she intentionally ignores that risk. A person does not, however, have to intend damage. [¶] Driving with willful or wanton disregard for the safety of

either driving with willful or wanton disregard for public safety or the commission of at least three traffic violations. The trial court also specified five possible traffic violations: (1) driving the wrong way on a one-way street (§ 21657); (2) exceeding the posted speed limit (§ 22351, subd. (b)); (3) driving with a child under 16 who is not wearing a seatbelt (§ 27360.5, subd. (b)); (4) failing to drive in the right-hand lane without leaving the roadway (§ 21650); and (5) improper turning (§ 22107).

### 2. Willful and Wanton Disregard for the Safety of Persons or Property Theory

Defendant argues that the trial court erred in instructing the jury that he could be convicted on the theory that he drove with willful and wanton disregard for public safety or property, because he did not drive dangerously after Sergeant St. Amour began following him.

Defendant's first argument is based on his interpretation of "pursuing," and he asserts that " 'a *pursuing* peace officer' " must be "behind the suspect's vehicle." Defendant points out that section 2800.1, subdivision (a)(1) requires the pursuing officer to illuminate a "red lamp visible from the front and the [suspect] 'either sees or reasonably should have seen the lamp.' " He claims that "this requirement makes no sense unless the officer is directly behind the driver." Defendant also asserts that since, "as a matter of custom, virtually all traffic stops are made by the use of flashing or colored lights when an officer gets directly behind the offending driver," "[t]he Legislature surely took this custom into consideration when it used the term 'pursuing.' "

 " 'Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose. [Citation.] We must look to the statute's words and give them their usual and ordinary meaning. [Citation.] The statute's plain meaning controls the court's interpretation unless its words are ambiguous.' " (*People v. Arias* (2008) 45 Cal.4th 169, 177 [85 Cal.Rptr.3d 1, 195 P.3d 103].)

"Pursue" is defined as "to follow in order to overtake, capture, kill, or defeat." (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 950 (Webster's).) A synonym for "pursue" is "chase." (*Ibid.*) There are distinctions between the words "chase," "pursue," "follow," and "trail." "CHASE implies going swiftly after and trying to overtake something fleeing or running <dog *chasing* a cat>. PURSUE suggests a continuing effort to overtake, reach, or attain <*pursued* the criminal through narrow streets>.

persons or property includes, but is not limited to, causing damage to property while driving or committing three or more violations that are each assigned a traffic violation point."

FOLLOW puts less emphasis upon speed or intent to overtake <friends *followed* me home in their car>. TRAIL may stress a following of tracks or traces rather than a visible object <*trail* deer> <*trailed* a suspect across the country>." (Webster's, at p. 193.)

In our view, the statutory language at issue is not ambiguous. The word "pursue" encompasses the concept of overtaking for capture, which does not necessarily require that the pursuing individual place himself or herself behind the suspect. Though the peace officer's vehicle will most often be behind the suspect's vehicle, this will not always be the case. As the facts before us demonstrate, an individual may be aware of being pursued by a peace officer even when the officer is not behind him or her. Here, Sergeant St. Amour testified that he saw defendant driving the wrong way on Second Street towards Keyes Street. The officer, who was driving on First Street, was able to view defendant, because there was a narrow park between First and Second Streets. Sergeant St. Amour activated his red lights and siren as he turned from First Street onto Keyes Street. At that point, defendant "reasonably should have seen" the red lights, and, given that he was driving the wrong way on a one-way street, been aware that the officer was pursuing him. The officer drove the short distance to Second Street and partially blocked the left and right lanes to prevent defendant, who was 75 to 100 feet from the intersection, from driving further. Under these circumstances, the pursuit began before the officer was behind defendant's vehicle.

We next consider defendant's challenge to the willful disregard of public safety theory of liability under section 2800.2. In determining whether the trial court properly allowed the jury to consider this issue, "[w]e review the whole record in the light most favorable to the judgment below to determine whether there is evidence which is reasonable, credible and of solid value, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. This inquiry does not require the reviewing court to ask itself whether *it* believes the evidence established guilt beyond a reasonable doubt but whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Dalerio* (2006) 144 Cal.App.4th 775, 780 [50 Cal.Rptr.3d 724].) Based on our conclusion that the pursuit began when Sergeant St. Amour activated his red lights and siren while driving to block defendant at the intersection, there was sufficient evidence to support the theory. Sergeant St. Amour saw three or four cars traveling towards defendant as he drove the wrong way on a one-way street. According to Adrienne, one of the cars was forced to swerve out of the way to avoid defendant. Thus, there was sufficient evidence that the jury could have found that defendant's conduct constituted willful and wanton disregard for the safety of Adrienne and the other driver as well as the other driver's car.

### 3. Traffic Violations*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. Penal Code Section 654*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. Disposition

The judgment is reversed and the matter is remanded for resentencing.

McAdams, J., and Duffy, J., concurred.

On October 16, 2009, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 18, 2010, S178689.

---

*See footnote, *ante*, page 125.